**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| CANINE TRANSPLANT & APHERESIS CENTER,<br><br>Plaintiff,<br><br>v.<br><br>NICOLE MOTAKEF,<br><br>Defendants. | DOCKET NO.<br><br>______________________________ |

## COMPLAINT

Plaintiff Canine Transplant & Apheresis Center ("CTAC"), through counsel and for its Complaint against Defendants Saba Motakef ("Mr. Motakef") and Nicole Motakef ("Defendant"), states as follows:

### PARTIES, JURISDICTION, AND VENUE

1. CTAC is a Tennessee limited liability company, registered to do business in this state, with a principal place of business located at 3800 Saint Elmo Avenue, Suite 306, Chattanooga, Tennessee 37409. Operating inside the Pullen Cancer Center, which is located at 3201 Broad Street, Chattanooga, Tennessee 37408, CTAC is one of only two Bone Marrow Transplant centers in the world led by a team of veterinary oncology specialists. CTAC is dedicated to providing curative options for dogs with blood cancers such as lymphoma and leukemia as well as non-cancerous diseases that affect the bone marrow.

2. Defendant is a citizen of California. She may be served with process at 5438 Shannon Drive, Yorba Linda, California 92886.

3. This Court has personal jurisdiction over Defendant because much of the conduct giving rise to this action occurred in Tennessee and relates to Defendant's contacts with Tennessee, including transacting business within this state, committing a tortious act within this state, and entering into a contract for services to be rendered in this state. Moreover, the exercise of personal jurisdiction over Defendant comports with traditional notions of fair play and substantial justice.

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy, excluding interests and costs, exceeds $75,000.

5. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this cause of action arose in this district.

**FACTS**

6. On May 15, 2025, Defendant executed a Treatment/Procedure Authorization (the "Authorization") form for a Bone Marrow Transplant procedure for her 10-year-old shih tzu. A true and correct copy of the Authorization, with personal identifying information redacted, is attached hereto as **Exhibit A**.

7. Under the "Payment Policy" section of the Authorization, Defendant was required to pay $40,000 prior to treatment, and then also make payment in full at the time of service unless other arrangements were made in advance. *See* Agreement, Ex. A, at 2.

8. Defendant paid the required $40,000 in advance.

9. On May 15, 2025, Defendant also executed a Liability Waiver and Owner Consent Agreement (the "Agreement"). A true and correct copy of the Agreement is attached hereto as **Exhibit B**.

10. The Agreement provides the following,

> By signing this consent form, I, the owner, acknowledge my understanding that there are possible life-threatening complications related to bone marrow transplantation and have the authority to execute this consent. These complications include but are not limited to potential toxicities related to the whole body radiation my dog will receive, the failure of my dog to engraft after transplantation, complications related to the bone marrow stem cell harvesting procedure, anesthetic risks and complications related to the priming procedure.

*See* Agreement, Ex. B, ¶ 1.

11. The Agreement also provides the following,

> I agree to pay for any additional medical care or procedures, including ICU charges, blood products, additional diagnostic tests, or more Neupogen, if the doctors deem necessary during this period. I understand that the estimate does not determine the final cost. I understand that the cost may be lower or higher than quoted depending on the medical needs of my pet while hospitalized.

*See* Agreement, Ex. B, ¶ 1.

12. Under the Agreement, Defendant "assume[d] financial responsibility for all charges incurred by th[e] patient" and also "agree[d] to pay all costs for th[e] procedure promptly upon being billed by CTAC, with billing normally occurring within 5 days upon completion of the procedure." *See* Agreement, Ex. B, ¶ 3.

13. Under the agreement, Defendant "agree[d] to assume all risks of poor outcomes" and also to "hold harmless CTAC and its agents and employees, in consideration for being allowed to participate in th[e] procedure." *See* Agreement, Ex. B, ¶ 3.

14. The principal veterinarians overseeing the procedure were Drs. Alexandra Gareau and Steven Suter.

15. Dr. Suter received a BS in Biology from Indiana University of Pennsylvania in 1981. He later went on to earn an MS in Biochemistry from New York Medical College in Valhalla, New York in 1991. He was accepted into the combined VMD/PhD program at the University of Pennsylvania where he earned his VMD and PhD in Cellular and Molecular Biology in 1995 and 2001, respectively. He subsequently completed a medical oncology residency at UC Davis and become a diplomate of the American College of Veterinary Internal Medicine (Oncology) in 2003.

16. In addition to his ongoing practice, Dr. Suter has been a member of the faculty at North Carolina State University since 2006 and is currently a Professor of Medical Oncology at North Carolina State University. He founded and ran the world's only academic canine apheresis and bone marrow transplant unit from 2008-2022, which also supported a unique two-year fellowship in canine bone marrow transplantation and apheresis. His laboratory houses the Canine and Feline Molecular Oncology Diagnostic Laboratory, which has been in continuous operation since 2007. He has also authored/co-authored over sixty manuscripts and books

chapters and is a well-known speaker at local, national, and international conferences. He is widely recognized as a leader in this field.

17. Dr. Gareau earned her veterinary and master's degrees at the University of Montreal and then completed a one-year medicine and surgery rotating internship at Purdue University. After that, Dr. Gareau pursued a residency in Medical Oncology at North Carolina State University. She then completed a two-year fellowship in canine stem cell transplantation and apheresis at the same institution under the mentorship of Dr. Suter. During her fellowship, Dr. Gareau collaborated with a multidisciplinary team, gaining expertise in the complexities of this advanced procedure. She has also contributed to published research in this field.

18. The procedure involved two dogs owned by Defendant. Their 10-year-old shih tzu was the recipient. Their other shih tzu was the donor.

19. The total fees associated with the procedures amounted to the following:

| | |
|---|---|
| Donor: | $24,657.93 |
| Recipient: | $77,622.81 |
| **Total:** | **$102,280.74** |
| LESS: | $40,000.00 (deposit) |

**Outstanding Balance: $62,280.74**

20. The fees associated with the Donor and Recipient are reflected in the invoices attached hereto as **Exhibit C**.

21. CTAC has made multiple attempts to secure payment of the outstanding balance but has been unable to secure any payment of any amount. The full outstanding balance remains due and owing.

22. Unfortunately, the procedure that has given years back to many patients had a tragic ending in this case. The treatment did not work for the recipient, and due to unforeseen issues that gave rise to significant complications, the donor was lost as well.

23. CTAC was in consistent contact with Defendant and her family regarding the tragic outcome, but Defendant and her husband eventually ceased communicating with CTAC altogether.

24. Since that time, Defendant has engaged in multiple attempts to defame CTAC and its renowned oncology specialists in an overt attempt to harm CTAC.

25. As of the time of this filing, CTAC is aware of at least one client who elected to take their pet to the only other transplant and apheresis center once they "heard that they were killing dogs" at CTAC. An example of one of Defendant's defamatory posts that has garnered significant attention is attached hereto as **Exhibit D**.

## COUNT I
## BREACH OF CONTRACT

26. CTAC repeats the allegations set forth in paragraphs 1 through 25.

27. The parties entered into a valid and enforceable contract on May 15, 2025, whereby CTAC agreed to provide certain services related to a Bone Marrow Transplant procedure and Defendant agreed to all payment terms and also accepted the risk of the procedure and agreed to hold CTAC and its doctors harmless in the event of an unsuccessful operation.

28. CTAC fully performed all obligations required under the contract.

29. Defendant materially breached the contract by failing to pay the amount of fees outstanding.

30. Defendant's breach was without legal justification or excuse.

31. Plaintiff provided Defendant multiple opportunities to cure the breach by making payment of the outstanding fees, but Defendant failed and refused to do so.

32. As a direct and proximate result of Defendant's breach, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited, total outstanding fees in the amount of **$62,280.74**.

**COUNT II**
**DEFAMATION**

33. CTAC repeats the allegations set forth in paragraphs 1 through 32.

34. On or about September 17, 2025, Defendant published a false and defamatory statement regarding CTAC and its renowned oncology specialists, which was made publicly via social media. *See* Reddit Post, Ex. D.

35. The statements made by Defendant were factually false and not subject to any legal privilege.

36. Defendant knew statements that she made were factually false and not subject to any legal privilege.

37. Alternatively, defendant knew or should have known that statements she made were factually false and not subject to any legal privilege.

38. Defendant made certain statements with actual malice—that is, with knowledge of its falsity or with reckless disregard for the truth—and with the specific

intent to harm CTAC's reputation, standing in the community, and/or professional relationships.

39. The defamatory statements were published to third parties and were reasonably understood to refer to CTAC. As a result, CTAC has been subjected to public ridicule and contempt.

40. CTAC has been made aware of one specific instance of a client changing their mind and taking their pet to the only other transplant and apheresis center specifically because of the statements Defendant published on social media.

41. The average fees associated with a Bone Marrow Transplant are approximately $80,000.00.

42. As a direct and proximate result of Defendant's defamatory conduct, CTAC has suffered actual damages, including but not limited to reputational harm, loss of business opportunities, and other economic and non-economic injuries.

43. CTAC seeks compensatory and punitive damages as permitted under Tennessee law.

## COUNT III
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

44. CTAC repeats the allegations set forth in paragraphs 1 through 43.

45. CTAC has established and maintained ongoing business relationships with specific third parties and/or a prospective relationship with an identifiable class of persons, including referring veterinary practices, clients, and business partners.

46. Defendant was aware of CTAC's existing and prospective business relationships and knew that CTAC relied on these relationships for continued business success.

47. Defendant intentionally and maliciously interfered with CTAC's business relationships by engaging in an online smear campaign with the purpose of causing harm to CTAC's business interests.

48. CTAC has been made aware of one specific instance of a client changing their mind and taking their pet to the only other transplant and apheresis center specifically because of the statements Defendant published on social media.

49. The average fees associated with a Bone Marrow Transplant are approximately $80,000.00.

50. Defendant's interference was conducted with improper motive and by improper means, including, but not limited to, making false and defamatory statements about CTAC and its oncology specialists and inducing third parties to breach or terminate their relationships with CTAC.

51. As a direct and proximate result of Defendant's tortious conduct, CTAC has suffered actual damages, including but not limited to loss of business opportunities, reputational harm, and economic losses.

52. CTAC seeks compensatory and punitive damages as permitted under Tennessee law.

**WHEREFORE**, CTAC prays as follows:

A. That process issue and a copy of this Complaint be served upon Defendant, requiring them to answer within the time set forth by the Tennessee Rules of Civil Procedure.

B. That at the trial of this case, judgment be entered in favor of CTAC and against Defendant in an amount to be determined at trial, but in no event less than $62,280.74, exclusive of interest and costs, as a result of Defendant's breach of conduct.

C. That at the trial of this case, judgment be entered in favor of CTAC and against Defendant in an amount to be determined at trial, but in no event less than $80,000, as a result of Defendant's defamatory conduct

D. That at the trial of this case, judgment be entered in favor of CTAC and against Defendant in an amount to be determined at trial, but in no event less than $80,000, as a result of Defendant's tortious interference with CTAC's business relationships.

E. That at the trial of this case, CTAC be awarded punitive damages, as permitted by Tennessee law, for the malicious, wanton, and reckless nature of Defendant's defamatory conduct and tortious interference with CTAC's business relationships.

F. To the extent permitted by statute, that CTAC be awarded is attorney's fees and costs from Defendant, including its discretionary costs.

G. That CTAC be awarded prejudgment interest;

H. That costs of this cause be taxed to Defendant; and

I. That CTAC be awarded such other, further, compensatory, incidental, special, and general damages to which it may be entitled.

Respectfully submitted this 16th day of October, 2025.

**CHARTWELL LAW**

By: *s/K. Chris Collins*
K. Chris Collins, Esq. | TN Bar No. 029109
100 W. Martin Luther King Blvd., Suite 300
T: (423) 205-2977
F: (423) 373-1435
kcollins@chartwelllaw.com
*Counsel for CTAC*